ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| **LUIS SAMUEL NEGRÓN CASTRO, *et als.*** <br><br> Apelados <br><br> v. <br><br> **HIRAM. M. SOLER BERNARDINI, su esposa MARISOL PORTILLA DELGADO y la Sociedad Legal de Bienes Gananciales compuesta por ambos; HOSPITAL EPISCOPAL SAN LUCAS PONCE; BERNARDO CAMPOS GONZÁLEZ, HOSPITAL ESPAÑOL AUXILIO MUTUO DE PUERTO RICO, INC.; BEAZLEY GROUP; THE MEDICAL PROTECTIVE COMPANY; SIMED; PUERTO RICO MEDICAL DEFENSE INSURANCE; JOHN DOE, RICHARD ROE** <br><br> Apelantes | KLAN202300984 <br><br> consolidado con <br><br> KLAN202300987 | **APELACIÓN** procedente del Tribunal de Primera Instancia, Sala Superior de **Ponce** <br><br> Civil Núm.: **J DP2018-0133** <br><br> Sobre: Impericia Prof. Médico Daños y Perjuicios |

Panel integrado por su presidente, el Juez Bermúdez Torres, el Juez Pérez Ocasio y la Jueza Boria Vizcarrondo[1].

Boria Vizcarrondo, Jueza Ponente.

### SENTENCIA

En San Juan, Puerto Rico, a 28 de junio de 2024.

El 3 de noviembre de 2023, comparecieron ante nos el Hospital Episcopal San Lucas Ponce (Hospital San Lucas) y su aseguradora, Beazley Group, mediante recurso de *Apelación* (KLAN202300984), en el cual nos solicitan que revoquemos la *Sentencia Parcial*[2] emitida por el Tribunal de Primera Instancia, Sala Superior de Ponce (TPI).

---

[1] Mediante la Orden Administrativa OATA-2023-212 de 6 de diciembre de 2023, se designó a la Hon. Lersy G. Boria Vizcarrondo como integrante de este Panel Especial en sustitución de la Hon. Ivelisse M. Domínguez Irizarry.

[2] Apéndice de *Apelación*, Anejo XX, págs. 753-780. Notificada y archivada en autos el 15 de marzo de 2023.

Por su parte, ese mismo día, mediante *Escrito de Apelación* (KLAN202300987) compareció el Sindicato de Aseguradores para la Suscripción Conjunta de Seguro de Responsabilidad Médico-Hospitalaria (SIMED) como aseguradora del Dr. Hiram M. Soler Bernadini (Dr. Soler Bernadini). En dicha comparecencia, también nos solicita que revoquemos la *Sentencia Parcial* emitida por el TPI.

Mediante su *Sentencia Parcial*, el TPI determinó que, "como cuestión de derecho que, a los codemandados, ***Dr. Hiram Soler Bernadini*** y el ***Hospital Episcopal San Lucas*** le son de aplicación los límites dispuestos en la [Ley Núm.] 136-2006, **no así a sus correspondientes aseguradoras, *SIMED* y *Beazley Group***".[3] Además, resolvió que dichos límites solo se activarán "una vez recaiga sentencia por actos constitutivos de negligencia médica hospitalaria".[4]

Por recurrirse de la misma *Sentencia Parcial*, el 14 de noviembre de 2023, este Tribunal ordenó la consolidación de los casos de epígrafe.

Por las razones que discutiremos a continuación, revocamos la *Sentencia Parcial* del TPI.

## I.

El caso ante nuestra consideración nos permitirá resolver una controversia recurrente en nuestra jurisdicción: si los límites de responsabilidad establecidos por el Artículo 2 de la Ley de Pleitos Contra el Estado, según enmendada, Ley Núm. 104 de 29 de junio de 1955, 32 LPRA sec. 3077 (Ley de Pleitos), extendidos a los Centros Médicos Académicos Regionales (CMAR) y su facultad docente por el Artículo 7 de la Ley de los Centros Médicos Académicos Regionales de Puerto Rico, Ley Núm. 136-2006, 24 LPRA sec. 10035 (Ley Núm. 136-2006) son también de aplicación a sus aseguradoras. Es decir,

---

[3] *Íd.*, pág. 779. (Énfasis en la original).
[4] *Íd.*, págs. 779-780.

si una aseguradora responde hasta el límite de responsabilidad establecido por ley, o si responde hasta el monto de su póliza pactada con su asegurado.

El caso de marras se originó el 9 de mayo de 2018, cuando el señor Luis Samuel Negrón Castro (Sr. Negrón Castro), Sonia Enid Lugo Ramos, la Sociedad de Gananciales compuesta por ambos y los menores N.A., V.S. y A.S. (en conjunto, los demandantes), presentaron una *Demanda*[5] en contra del Dr. Soler Bernadini, su esposa, la Sociedad de Gananciales compuesta por ambos, el Hospital San Lucas, el doctor Bernardo Campos González (Dr. Campos González), el Hospital Auxilio Mutuo de Puerto Rico (Hospital Auxilio Mutuo), Beazley Group, the Medical Protective Company, Puerto Rico Medical Defense y SIMED (en conjunto, Codemandados). Según la *Demanda*, los codemandados responden solidariamente por los daños sufridos por el Sr. Negrón Castro y los demandantes, alegadamente causados por actos constitutivos de impericia médica.

Según alegaron los demandantes, para el año 2017, el Sr. Negrón Castro comenzó a sentir molestias abdominales, por lo que su gastroenterólogo, el Dr. Martínez Sierra, le diagnosticó "presencia de cálculos en la vesícula" y lo refirió al cirujano, Dr. Soler Bernadini para cirugía y remoción de la vesícula. También fue evaluado por el Dr. Rodríguez Arias, quien estuvo de acuerdo con la cirugía. Dicha cirugía fue programada para el 24 de abril de 2017 en el Hospital San Lucas de Ponce. Ese día, el Dr. Soler Bernadini le realizó la cirugía, utilizando un instrumento "Endo-GIA" para "dividir y ligar el conducto cístico y la arteria cística, para poder remover la vesícula

---

[5] Apéndice del *Escrito de Apelación*, Anejo IV, págs. 29-41. (La *Demanda* presentada el 9 de mayo de 2018, *Íd.*, Anejo I, págs. 1-12, fue enmendada posteriormente el 30 de enero de 2019 y por una segunda vez el 29 de septiembre de 2021).

del lecho del hígado, previa disección en esa área".[6] Realizada la cirugía, el Sr. Negrón Castro fue dado de alta el 25 de abril de 2017.

Entre el 25 de abril y 2 de mayo de 2017, el Sr. Negrón Castro no se sintió bien; le manifestó a su esposa que sentía dolores abdominales, por lo que ella llamó al Dr. Soler Bernadini para adelantar su cita de seguimiento para el 2 de mayo de 2017. En dicha cita, el Dr. Soler Bernadini lo refirió a la Sala de Emergencias del Hospital San Lucas, donde fue hospitalizado, estando "amarillo y con deshidratación severa".[7] El 3 de mayo de 2017, la gastroenteróloga no identificada en la *Demanda* le realizó una endoscopía que identificó "una obstrucción del conducto biliar común, ocasionado por clip" alegadamente atribuible a la cirugía del Dr. Soler Bernadini.[8]

Así las cosas, el 7 de mayo de 2017, el Sr. Negrón Castro fue referido por el personal del Hospital San Lucas al Dr. Campos González, especialista en cirugía hepatobiliar, en el Hospital Auxilio Mutuo en San Juan. La cirugía reconstructiva fue pautada para el 10 de mayo de 2017. En su diagnóstico, el Dr. Campos González anotó que el Sr. Negrón Castro sufría de "*Iatrogenic transection of bile duct at hilum*", lo que bloqueó la salida de la bilis que se produce en el hígado.[9] Los demandantes atribuyen esto a las acciones del Dr. Soler Bernadini durante la cirugía realizada el 24 de abril 2017. El 10 de mayo de 2017, luego de que el Dr. Campos González culminara la cirugía programada, el Sr. Negrón Castro fue ubicado en la Unidad de Cuidado Intensivo del Hospital Auxilio Mutuo. Dos días más tarde, el 12 de mayo de 2017, desarrolló un "cuadro de sangramiento masivo gastrointestinal alto", ocasionando un "shock hipovolémico".[10] Ante este cuadro, se le realizaron transfusiones de

---

[6] *Íd.*, pág. 32.
[7] *Íd.*
[8] *Íd.*, pág. 33.
[9] *Íd.*, pág. 34.
[10] *Íd.*, págs. 34-35.

sangre para estabilizarlo. Luego, a las 4:00pm de esa tarde, el Sr. Negrón Castro sufrió un paro cardiaco de diez (10) minutos, con convulsiones durante la noche. El 13 de mayo de 2017, surgió "evidencia clínica de severo daño cerebral, [evidenciado por] asimetría de las pupilas".[11] La neuróloga consultada determinó que había "daño cerebral irreversible", que eventualmente se confirmó como muerte cerebral y estado permanente vegetativo.[12]

Por los hechos alegados, los demandantes presentaron una *Demanda* contra los codemandados por impericia médica. El TPI ordenó la paralización de los procedimientos contra el Dr. Campos González por este haber radicado una petición de quiebras ante el foro federal. El 27 de septiembre de 2019, luego de varios trámites procesales, el Dr. Soler Bernadini presentó una *Moción Solicitando Sentencia Sumaria Parcial*,[13] mediante la cual arguyó que, en el caso de marras, eran de aplicación los límites de responsabilidad contemplados en la Ley de Pleitos Contra el Estado, según enmendada, Ley Núm. 104 de junio de 1955, 32 LPRA sec. 3077 *et seq.* (Ley de Pleitos). Esto puesto que la Ley de los Centros Médicos Académicos Regionales de Puerto Rico, según enmendada, Ley Núm. 136-2006, 24 LPRA sec. 10031 *et seq.* (Ley Núm. 136-2006), extiende los límites de la Ley de Pleitos Contra el Estado "a los Centros Médicos Académicas Regionales (CMAR), estudiantes, médicos en adiestramiento postgraduado y miembros de la facultad de los mismos, por los procedimientos médicos que se llevan a cabo" en los CMAR.[14] Por lo tanto, le solicitó al TPI que aplicara el límite de responsabilidad de $75,000.00 a la presente causa de acción.[15]

---

[11] *Íd.*, pág. 35.
[12] *Íd.*
[13] *Íd.*, Anejo VIII, págs. 64-72.
[14] *Íd.*, págs. 69-70.
[15] *Íd.*, pág. 70.

El 17 de octubre de 2019, los demandantes se opusieron a la *Moción de Sentencia Sumaria*.[16] En esta *Oposición*, arguyeron que:

> [E]l Dr. Soler [Bernadini] es el único médico que es parte de [un] CMAR. Los topes de responsabilidad aplicables a la presente causa de acción, de evidenciar que el Dr. Soler en efecto, realizó la operación al Sr. Luis S. Negrón Castro como parte de sus labores docentes, se extienden a la suma de $150,000.00 por reclamar daño[s] varios co-demandantes según surge del cuerpo de la demanda enmendada.[17]

La parte demandante además arguyó que el Dr. Soler Bernadini no incluyó en la *Moción de Sentencia Sumaria* evidencia de que, en efecto, operó al Sr. Negrón Castro como parte de su labor docente el 24 de abril de 2017. Tampoco incluyó prueba de que los residentes, cuyos contratos forman parte de los anejos incluidos por la parte codemandada, formaron parte de la operación. El 27 de noviembre de 2019, el TPI declaró No Ha Lugar la *Moción de Sentencia Sumaria* por entender que esta no atendió la adjudicación de una reclamación de la *Demanda* y que "sería impropio declarar la posible responsabilidad sin adjudicar si hubo alguna, que permita concluir que le aplican los topes de Ley".[18]

El 5 de julio de 2021, falleció el Sr. Negrón Castro, alegadamente como consecuencia de la negligencia de la parte demandada. Por lo tanto, el 26 de octubre de 2021, los demandantes presentaron una *Demanda Enmendada*.[19]

Así las cosas, y luego de culminar el proceso del descubrimiento de prueba, el 22 de junio de 2022, el Dr. Soler Bernadini presentó una *Segunda Moción Solicitando que se Dicte Sentencia Parcial Sobre los Límites Aplicables al Caso Conforme Dicha Ley* (*Moción de Sentencia Sumaria* del Dr. Soler Bernadini).[20] En esta, el Dr. Soler Bernadini le solicitó al TPI que emitiera una

---

[16] *Íd.*, Anejo IX, págs. 73-82.
[17] *Íd.*, págs. 81-82.
[18] *Íd.*, Anejo X, pág. 86.
[19] *Íd.*, Anejo XII, págs. 87-99.
[20] *Íd.*, Anejo XV, págs. 114-125.

sentencia sumaria parcial únicamente para fijar los límites de responsabilidad aplicables al caso, según la Ley Núm. 136-2006, *supra*, previo la celebración de vistas en el mismo.[21] El Dr. Soler Bernadini arguyó que según la prueba, alegadamente participaron estudiantes y médicos en entrenamiento de la Residencia de Cirugía durante el tratamiento médico recibido por el Sr. Negrón Castro en el Hospital San Lucas. En consecuencia, el caso ya tenía la "madurez para que este Honorable Tribunal[,] en esta etapa de los procedimientos[,] considere esta solicitud[...]",[22] y que, si en algún futuro, el TPI determina algún tipo de responsabilidad monetaria, le serán de aplicación las cuantías máximas establecidas estatutariamente de $75,000.00 por los daños sufridos por una persona o un máximo de $150,000.00 cuando hayan sufrido daños más de una persona, conforme a la Ley de Pleitos, *supra*, y la Ley Núm. 136-2006, *supra*.

El 11 de agosto de 2022, la parte demandante presentó una *Moción Solicitando Sentencia Sumaria Parcial* (*Moción de Sentencia Sumaria* de la parte demandante).[23] Mediante esta, los demandantes le solicitaron al TPI que determinara que SIMED y Beazley Group, "que no practican la medicina y no son parte del CMAR, [no] están facultados en ley y [no] pueden [beneficiarse] de los topes de responsabilidad" dispuestos en la Ley Núm. 136-2006.[24] Alegaron que dicha ley "no incluye en ninguno de sus incisos que dichos topes de responsabilidad se extiendan a las compañías aseguradoras".[25] Dispuso además que no existen hechos en controversias que impidieran que el TPI dicte sentencia sumaria parcial sobre este

---

[21] *Íd.*, pág. 114.
[22] *Íd.*
[23] *Íd.*, Anejo XVI, págs. 126-145.
[24] *Íd.*, pág. 137.
[25] *Íd.*

asunto.[26] En consecuencia, argumentaron que ambas aseguradoras deben responder hasta el monto total de su cubierta.[27]

El 16 de agosto de 2022, compareció SIMED en oposición a la *Moción de Sentencia Sumaria* de la parte demandante.[28] En esta, argumentó que, "por aplicación de las disposiciones y principios establecidos en el Código de Seguros, que las compañías aseguradoras de tales codemandados estarán expuestas a responder <u>hasta el grado de responsabilidad de sus asegurados</u>".[29] Por su parte, el 14 de septiembre de 2024, comparecieron el Hospital San Lucas y Beazley Group para unirse a la *Moción* del Dr. Soler Bernadini[30] y el 23 de septiembre de 2022 presentaron su oposición a la *Moción* de la parte demandante.[31] En esta, se unió a los argumentos de SIMED, incluyendo como anejo el contrato entre Beazley Group y el Hospital San Lucas.

En resumen, el TPI tenía ante sí dos mociones de sentencia sumaria: una moción de codemandados solicitándole que le aplique los límites de responsabilidad de la Ley de Pleitos al Hospital San Lucas y al Dr. Soler Bernadini por ser doctor-profesor en un CMAR y haber actuado en dicha función durante su intervención médica con el Sr. Negrón Castro y, otra moción, por parte de los demandantes, solicitándole que no le aplique dichos límites a las aseguradoras del Hospital San Lucas y del Dr. Soler Bernadini por estas no estar contempladas por la Ley Núm. 136-2006. La posición de SIMED y Beazley Group en cuanto a la *Moción* de la parte demandante se resume en que los límites de la Ley Núm. 136-2006 les aplican de forma indirecta, puesto que sólo deben responder hasta el grado de responsabilidad de sus asegurados.

---

[26] *Íd.*, pág. 138.
[27] *Íd.*, pág. 139.
[28] *Íd.*, Anejo XVII, págs. 146-153.
[29] *Íd.*, pág. 151. (Énfasis en la original).
[30] Apéndice de *Apelación, supra,* Anejo XIX, págs. 670-752.
[31] *Íd.*, Anejo XVIII págs. 575-669.

Así las cosas, y con las comparecencias de las partes, el 13 de marzo de 2023, el TPI emitió la *Sentencia Parcial* de la cual se recurre.[32] En esta, atendió las mociones de las partes, primero resolviendo que los límites de responsabilidad eran de aplicación al Dr. Soler Bernadini y al Hospital San Lucas. El TPI entendió que el Dr. Soler Bernadini pudo establecer, mediante una declaración jurada, tener rango de Instructor del Departamento de Cirugía de los Médicos Residentes del Programa de Cirugía, así como con los estudiantes de la Escuela de Medicina, y que estos intervinieron, bajo su supervisión e instrucción, durante la hospitalización del Sr. Negrón Castro en el Hospital San Lucas el 24 de abril de 2017 y entre el 2 al 7 de mayo de 2017.[33] Además, concluyó que es un "hecho incontrovertible de que el Sr. Luis Samuel Negrón Castro fue atendido en el Hospital Episcopal San Lucas, el cual es un [CMAR], conforme lo establecido en la [Ley Núm. 136-2006] [...]".[34] Por lo tanto, no está en controversia el hecho de que los límites de responsabilidad de la Ley de Pleitos le son de aplicación al Hospital San Lucas y al Dr. Soler Bernadini.

En cuanto a las aseguradoras, el TPI no les dio la razón. Este determinó que:

> Del ordenamiento jurídico reseñado, surge que el Artículo 7 de la Ley Núm. 136-2006, *supra*, y el Artículo 41.050 del Código de Seguros de Puerto Rico, [26 LPRA sec. 4105], establece[n] claramente la extensión del límite de responsabilidad que [le] aplica al Estado a los [CMAR], cuando recaiga una sentencia por actos de impericia médico-hospitalaria cometidos por sus estudiantes y miembros de su facultad en el desempeño de sus funciones docentes. **Es decir, el límite de responsabilidad solo aplica ante actos culposos y negligentes de estudiantes y miembros de la facultad médica en funciones docentes.** No obstante, no cubre a médicos y otro personal de un hospital que no es parte del programa académico. Por consiguiente, **de probarse los elementos de la causa de acción de impericia médico-hospitalaria, por actos cometidos por el personal no docente, el hospital respondería**

---

[32] *Íd.*, Anejo XX, págs. 753-780.
[33] *Íd.*, págs. 775-776.
[34] *Íd.*, pág. 776.

**de manera vicaria, sin el beneficio de los límites de responsabilidad**.[35]

El TPI entendió que la Ley Núm. 136-2006 establece una protección "personalísima" para los doctores-profesores laborando en un CMAR. Por lo tanto, concluyó que "surge claramente de la Ley Núm. 136-2006 que la misma no se extiende a las aseguradoras".[36] Por lo tanto, SIMED y Beazley Group deben responder hasta el límite de responsabilidad dispuesto en la póliza o contrato que tengan con su asegurado.

El 30 de marzo de 2023, SIMED presentó una *Moción Bajo las Reglas 43.2 y 47 de Procedimiento Civil*,[37] a la cual se unieron el Hospital San Lucas y Beazley Group. En esta le solicitó al TPI que enmendara y reconsiderara su *Sentencia Parcial*. Luego de varios trámites procesales, el 3 de octubre de 2023, el TPI emitió una *Resolución*[38] en la que enmendó sus determinaciones de hechos para acoger un hecho adicional incontrovertido presentado por SIMED. Sin embargo, determinó No Ha Lugar a la reconsideración solicitada. Sobre esto, dispuso:

> De esta forma, reconocemos que la Póliza emitida por SIMED a favor de su asegurado el Dr. Soler Bernadini dispone que SIMED será responsable del pago de todas las cantidades que el asegurado **pueda ser legalmente obligado a pagar como daños**. No obstante, **nos reiteramos en que tal disposición contractual no es contraria a nuestra determinación de que los límites dispuestos en la [Ley Núm. 136-2006], <u>no son de aplicación a las aseguradoras,</u> *SIMED* y *Beazley Group*.** Adviértase que de recaer una sentencia por actos constitutivos de negligencia médica hospitalaria en contra del asegurado existe la posibilidad que su responsabilidad legal exceda los límites dispuestos en la [Ley Núm. 136-2006]. En este escenario, sus respectivas aseguradoras vendrían llamadas a responder por dicho exceso hasta los límites de las correspondientes pólizas expedidas.[39]

---

[35] *Íd.*, págs. 776-777. (Énfasis nuestro).
[36] *Íd.*, págs. 777-778.
[37] *Íd.*, Anejo XXI, págs. 781-794.
[38] *Íd.*, Anejo XXX, págs. 822-828.
[39] *Íd.*, pág. 828. (Énfasis nuestra y en la original).

Inconforme con dicha *Resolución,* el 3 de noviembre de 2023, el Hospital San Lucas y Beazley Group presentaron una *Apelación* con referencia de KLAN202300984. En esta, señaló tres errores:

**ERRÓ EL TPI AL DETERMINAR QUE LOS LÍMITES DE RESPONSABILIDAD ESTABLECIDOS EN VIRTUD DE LA [LEY NÚM. 136-2006] CONSTITUYEN UNA DEFENSA PERSONALÍSIMA.**

**ERRÓ EL TPI AL DETERMINAR QUE SI LA RESPONSABILIDAD LEGAL DEL HOSPITAL SAN LUCAS EXCEDIERA LOS LÍMITES DISPUESTOS EN LA [LEY NÚM. 136-2006], BEAZLEY GROUP RESPONDERÍA POR ENCIMA DE DICHOS LÍMITES.**

**ERRÓ EL TPI AL IGNORAR LAS CLÁUSULAS CONTRACTUALES CONTENIDAS EN LA PÓLIZA EXPEDIDA POR BEAZLEY GROUP A FAVOR DE HOSPITAL SAN LUCAS, QUE ESTABLECEN CLARAMENTE QUE SU OBLIGACIÓN ES PAGAR HASTA LA CANTIDAD TOTAL EN DAÑOS QUE DICHO HOSPITAL ESTUVIESE LEGALMENTE OBLIGADO A PAGAR.**

Por su parte, el mismo día, SIMED presentó un *Escrito de Apelación* con referencia de KLAN202300987. En esta, señaló dos errores:

**COMETIÓ ERROR EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL RESOLVER QUE LOS LÍMITES DE LA [LEY NÚM. 136-2006] NO SON OPONIBLES A LAS ASEGURADORAS.**

**COMETIÓ ERROR EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL RESOLVER QUE LAS ASEGURADORAS PODRÍAN TENER QUE RESPONDER POR UN EXCESO, HASTA LOS LÍMITES DE LA PÓLIZA, DADA LA "POSIBILIDAD" DE QUE LA RESPONSABILIDAD LEGAL DE SU ASEGURADO EXCEDA LOS LÍMITES DISPUESTOS EN LA [LEY NÚM. 136-2006].**

## II.

### A.

La sentencia sumaria es un mecanismo procesal que provee nuestro ordenamiento para propiciar la solución justa, rápida y económica de controversias en las cuales resulta innecesario celebrar un juicio plenario. *Meléndez González et al. v. M. Cuebas, Inc.,* 193 DPR 100, 115 (2015); *SLG Zapata-Rivera v. J.F. Montalvo,* 189 DPR 414, 430 (2013); *Const. José Carro v. Mun. Dorado,* 186

DPR 113, 128 (2012); *Mejías et al. v. Carrasquillo et al.*, 185 DPR 288, 299 (2012). La Regla 36 de Procedimiento Civil, 32 LPRA Ap. V, R. 36, permite dictar sentencia sumaria sobre la totalidad o sobre parte de una reclamación. Su función esencial es permitir en aquellos litigios de naturaleza civil que una parte pueda mostrar previo al juicio que, tras las partes contar con la evidencia que ha sido debidamente descubierta, no existe una controversia material de hecho que deba ser dirimida en un juicio plenario y que, por tanto, el tribunal está en posición de aquilatar esa evidencia para disponer del caso ante sí. *Rodríguez Méndez, et als v. Laser Eye*, 195 DPR 769, 784-785 (2016); *Lugo Montalvo v. Sol Meliá Vacation*, 194 DPR 209, 223 (2015); *Const. José Carro v. Mun. Dorado, supra*, pág. 128.

La Regla 36 de Procedimiento Civil dispone que la solicitud de sentencia sumaria puede ser presentada por cualquiera de las partes que solicite un remedio por medio de una moción fundada en declaraciones juradas o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes. Se dictará sentencia sumaria si las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, junto a cualquier declaración jurada que se presente, si alguna, demuestran que no hay controversia real y sustancial sobre algún hecho esencial y pertinente y que, como cuestión de Derecho, procede hacerlo. Regla 36.3 (e) de Procedimiento Civil, *supra*; *SLG Zapata-Rivera v. J.F. Montalvo, supra.* Es decir, únicamente procede en aquellos casos en los que no existen controversias reales y sustanciales en cuanto los hechos materiales, por lo que lo único que queda, por parte del poder judicial, es aplicar el Derecho. *Oriental Bank v. Perapi S.E,* 192 DPR 7, 25 (2014); *SLG Zapata-Rivera v. J.F. Montalvo, supra*; *Nieves Díaz v. González Massas*, 178 DPR 820, 848 (2010).

Sobre el particular, hay que señalar que un hecho material es aquel que puede afectar el resultado de la reclamación al amparo del Derecho sustantivo aplicable. *Ramos Pérez v. Univisión,* 178 DPR 200, 213 (2010) (citando a J.A. Cuevas Segarra, *Tratado de Derecho Procesal Civil,* San Juan, Pubs. J.T.S., 2000, T. I, pág. 609); *Abrams Rivera v. E.L.A.,* 178 DPR 914, 932 (2010). La calidad del "hecho material" debe ser suficiente como para que sea necesario que un juez o jueza la dirima a través de un juicio plenario. *Ramos Pérez v. Univisión, supra.* Es decir, luego de aquilatar prueba testifical y de dirimir cuestiones de credibilidad.

Para demostrar de manera efectiva la inexistencia de controversia de hechos, la parte promovente está obligada a exponer las alegaciones de las partes, desglosar los hechos sobre los cuales aduce no hay controversia en párrafos debidamente numerados y para cada uno de ellos deberá especificar la página o párrafo de la declaración jurada u otra prueba admisible en evidencia que los apoye y las razones por las cuales debe ser dictada la sentencia argumentando el derecho aplicable. Regla 36.3 (a) (1)-(4) de Procedimiento Civil, *supra*; *SLG Zapata-Rivera v. J. F. Montalvo, supra,* pág. 432.

La parte que se oponga a que se dicte sentencia sumaria, según la citada Regla 36.3 de Procedimiento Civil, *supra,* deberá controvertir la prueba presentada por la parte que la solicita. Para ello, deberá cumplir con los mismos requisitos con los que tiene que cumplir el proponente, pero, además, su solicitud deberá contener:

> [U]na relación concisa y organizada, con una referencia a los párrafos enumerados por la parte promovente, de los hechos esenciales y pertinentes que están realmente y de buena fe controvertidos, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen los mismos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal. *Íd.,* Regla 36.3 (b) (2).

De no hacerlo, correrá el riesgo de que la solicitud de sentencia sumaria sea acogida por el tribunal y se resuelva en su contra. *Ramos Pérez v. Univisión, supra,* pág. 215; *Luan Invest. Corp. v. Rexach Const. Co.,* 152 DPR 652, 665-666 (2000).

La parte promovente puede prevalecer por la vía sumaria, si presenta prueba incontrovertida sobre todos los elementos indispensables de su causa de acción. La promovida puede derrotar la moción de sentencia sumaria de tres maneras: (1) si establece una controversia real de hechos sobre uno de los elementos de la causa de acción de la parte demandante, (2) si presenta prueba que apoye una defensa afirmativa, (3) si presenta prueba que establezca una controversia sobre la credibilidad de los testimonios jurados que presentó la demandante. *Ramos Pérez v. Univisión, supra,* pág. 217.

Es norma firmemente establecida que toda duda sobre la existencia de una controversia de hechos bona fide debe ser resuelta contra la parte que solicita la sentencia sumaria. *SLG Zapata-Rivera v. J.F. Montalvo, supra*; *Córdova Dexter v. Sucesión Ferraiuoli,* 182 DPR 541, 556 (2011). Por lo tanto, al determinar si existen controversias de hechos que impiden dictar sentencia sumaria, el juzgador debe analizar los documentos que acompañan la solicitud de sentencia sumaria y los documentos incluidos con la oposición, así como los que obren en el expediente. Dicho examen debe ser guiado por el principio de liberalidad a favor de la parte que se opone a que se dicte sentencia sumaria. *Ramos Pérez v. Univisión, supra.* De existir dudas sobre la existencia de una controversia de hechos, estas deben resolverse en contra del promovente, ya que este mecanismo procesal no permite que el tribunal dirima cuestiones de credibilidad. *Mgmt. Adm. Servs. Corp. v. E.L.A.,* 152 DPR 599, 610 (2000); *Cuadrado Lugo v. Santiago Rodríguez,* 126 DPR 272, 279-280 (1990); *Corp. Presiding Bishop v. Purcell,* 117 DPR 714, 720 (1986).

**B.**

Sabido es que el Gobierno de Puerto Rico disfruta de inmunidad soberana, por lo que no puede ser demandado salvo que este lo permita expresamente.[40] *Porto Rico v. Rosaly*, 227 US 270, 273 (1913). Como una renuncia parcial de su inmunidad soberana, el Gobierno de Puerto Rico aprobó la Ley de Pleitos, *supra,* que crea una causa de acción para demandar al Gobierno de Puerto Rico por los daños y perjuicios causados por los actos u omisiones "de cualquier funcionario, agente o empleado del Estado, o cualquier otra persona actuando en capacidad oficial y dentro del marco de su función, cargo o empleo interviniendo culpa o negligencia". *Íd.*, Art. 2(a). En virtud de esta ley, el Estado responde por los actos u omisiones culposas o negligentes de un funcionario. Esto impide que un demandante persiga una acción en contra de un funcionario del Gobierno luego de haber recaído una sentencia en contra del Estado. *Viuda de Valentín v. E.L.A.*, 84 DPR 112, 120 (1961). Esto puesto que la Ley de Pleitos persigue "evitar que un demandante recobre tanto del Gobierno como del empleado". *De Paz Lisk v. Aponte Roque*, 124 DPR 472, 493 (1989). Por lo tanto, la Ley de Pleitos no crea una inmunidad sino un límite de responsabilidad a favor del Estado, que "se refiere a una limitación impuesta por la Asamblea Legislativa a las cuantías compensables por actos u omisiones culposos o negligentes". *Rodríguez Figueroa et al. v. Centro de Salud*, 197 DPR 876, 884 (2017). Es importante destacar que la responsabilidad jurídica por actos culposos o negligentes de una persona es distinta e independiente de los daños que esta haya causado. El Estado no puede limitar los daños que haya sufrido una

---

[40] En *Porto Rico v. Rosaly*, 227 US 270 (1913), el Tribunal Supremo de Estados Unidos resolvió que: "It is not open to controversy that, aside from the existence of some exception, the government which the organic act established in Porto Rico is of such nature as to come within the general rule exempting a government sovereign in its attributes from being sued without its consent."

persona; el Estado sólo puede limitar el monto de su responsabilidad.

El Estado, mediante legislación, puede extender los límites de responsabilidad que le cobijan a personas o entidades que no son empleados directos del Gobierno. En virtud de dicha potestad, el 27 de julio de 2006, el Gobierno de Puerto Rico aprobó la Ley Núm. 136-2006. Mediante esta, el Estado creó los Centros Médicos Académicos Regionales (CMAR) con el propósito de fortalecer y desarrollar un sistema integrado de salud pública, desarrollar programas de educación para los profesionales de salud que no cuentan con suficientes espacios de internado y residencia para rendir sus servicios y proseguir con sus prácticas, y evitar poner en riesgo la acreditación de programas de educación y adiestramiento existentes, al igual que el éxodo de nuestros profesionales de salud. *Rodríguez Figueroa et al. v. Centro de Salud, supra*, págs. 881-882.

En su séptimo artículo, esta dispone que:

> **Se extenderán las limitaciones impuestas en la Ley Núm. 104 de 29 de junio de 1955, según enmendada, a los Centros Médicos Académicos Regionales, y miembros de facultad de estos**, por los procedimientos médicos que se lleven a cabo en dichos Centros en el ejercicio de sus funciones académicas y docentes. **Dicha limitación establece un máximo de $75,000 por los daños sufridos por una persona y hasta $150,000 cuando los daños y perjuicios se le causaron a más de una persona, o cuando sean varias las causas de acción a que tenga derecho un solo perjudicado**. Además, se extenderá la inmunidad para que no sean acumulados en un pleito ante los tribunales o cualquier foro con competencia, a todos los estudiantes, médicos residentes, médicos en programa de internados y médicos en adiestramiento post graduado y/o en entrenamiento de las instituciones médico-hospitalarias públicas y privadas. Lo aquí dispuesto será un eximente de responsabilidad, a los fines de extender la inmunidad absoluta provista en las acciones por daños y perjuicios por actos de impericia médico-hospitalarias públicas y privadas como parte de un contrato como médico residente con el Departamento de Salud de Puerto Rico, con la Universidad de Puerto Rico o con un Programa de Educación Médica Graduada acreditado por el "*Accreditation Council of Medical Education*" (ACGME). Se establece que en los casos en donde aplica la inmunidad absoluta los médicos en programa de

internado y residentes estarán exentos de mantener una póliza de responsabilidad por impericia médica según dispone el Artículo 41.050 del Código de Seguros de Puerto Rico.

Art. 7, Ley Núm. 136-2006, *supra*. (Énfasis nuestro).

Mediante este Artículo, se extendieron a los estudiantes, médicos en adiestramientos posgraduados y miembros de facultad que realicen procedimientos médicos en los Centros Médicos Académicos Regionales las limitaciones de responsabilidad que disfruta el Estado al amparo de la Ley de Pleitos. Este beneficio es extensivo tanto a los hospitales y centros de salud como a su facultad docente. En lo pertinente a la controversia ante nuestra consideración, nuestro Tribunal Supremo ha reconocido que el Hospital San Lucas, como parte de un consorcio con la Escuela de Medicina de Ponce, "estaba sujeto a los límites de responsabilidad establecidos por la Ley Núm. 136[-2006]". *Ortiz et al. v. Hosp. San Lucas et al.*, 205 DPR 222, 230 (2020). En consecuencia, no existe controversia en cuanto a la aplicación del límite de responsabilidad a favor del Hospital San Lucas y su facultad docente, como es el Dr. Soler Bernadini.

## C.

Entre los contratos reconocidos por nuestro ordenamiento jurídico están aquellos a favor de los terceros. Los contratos a favor de tercero "son únicamente aquellos que las partes celebran para atribuir de manera directa o indirecta un derecho a un tercero, que, sin embargo, no ha tenido participación ni directa ni indirecta en la celebración del negocio y que no queda por consiguiente obligado ni vinculado por él". L. Díez-Picazo, *Fundamentos del Derecho Civil Patrimonial*, Madrid, Ed. Tecnos, 1979, Vol. 1, pág. 296. "Es el contrato en el que una de las partes conviene con la otra la realización de una prestación en provecho de un tercero, esto es, de una persona ajena a la conclusión del contrato y que no está

representada en el mismo". J. Puig Brutau, *Compendio de derecho civil*, 2ª ed. rev., Barcelona, Ed. Bosch, 1994, Vol. II, pág. 237. El Artículo 1209 del Código Civil de 1930,[41] (30 LPRA sec. 2994) (Código Civil de 1930), reconoce la validez de estos contratos en Puerto Rico, disponiendo que "[s]i el contrato contuviere alguna estipulación en favor de un tercero, éste podrá exigir su cumplimiento, siempre que hubiese hecho saber su aceptación al obligado antes de que haya sido aquélla revocada".

La figura del contrato a favor de tercero tiene su mayor expresión en los contratos de seguros. "Un contrato de seguro es un acuerdo mediante el cual una persona se obliga a indemnizar a otra, o a proveerle un beneficio específico o determinable, ante la ocurrencia de un suceso incierto pero previsto en el contrato". *S.L.G. Francis-Acevedo v. SIMED*, 176 DPR 372, 384 (2009). "Como norma general, los contratos de seguro tienen como característica esencial la obligación de indemnizar. [...] Asimismo, otro requisito esencial de un contrato de seguro es la asunción de un riesgo de pérdida y el compromiso de asegurar contra dicha pérdida". *OCS v. CODEPOLA*, 202 DPR 842, 859 (2019).

El negocio de los seguros está revestido de un alto interés público, por lo que el Estado ha considerado apropiado regirlo mediante su propia legislación especial, el Código de Seguros de Puerto Rico, *supra*. Ante el marco interpretativo de los contratos de seguros, el Código Civil de 1930 regirá las normas sobre la contratación de forma supletoria. *S.L.G. Francis-Acevedo v. SIMED, supra*, pág. 384. Nuestro Tribunal Supremo ha resuelto que los contratos de seguros son contratos de adhesión, que son "aquellos contratos en que una sola de las partes dicta las condiciones del

---

[41] Aunque el Código Civil de 1930 fue derogado tras la aprobación del Código Civil de 2020, Ley Núm. 55-2020, (31 LPRA sec. 5311 et seq.), hacemos referencia al Código Civil de 1930, puesto que estaba vigente al momento de los hechos del presente caso.

contrato que ha de aceptar la otra". *Zequeira v. CRUV*, 83 DPR 878, 880 (1961). Esto puesto que los modelos de pólizas de seguros deben ser aprobados por el Comisionado de Seguros, antes de ofrecerse a la venta. Art. 11.110, Código de Seguros de Puerto Rico, *supra.* Los mismos no son el producto de una negociación entre el asegurador y el asegurado; son prefijados por el asegurador sin que el asegurado tenga la facultad de variarlos. *S.L.G. Francis-Acevedo v. SIMED*, *supra*, pág. 386.

"Como un contrato de adhesión, el de seguros debe interpretarse liberalmente a favor del asegurado para así sostener la cubierta por vía de una interpretación razonable". *Íd.* Aun así, no podemos obviar que los contratos de seguros siguen siendo contratos, por lo que rigen su eficacia y alcance son las cláusulas pactadas. "**Al igual que todo contrato, el contrato de seguro constituye la ley entre las partes**" y "**debe interpretarse globalmente**, **a partir del conjunto total de sus términos y condiciones**, según se expresen en la póliza y según se hayan ampliado, extendido o modificado dichos términos por cualquier aditamento, endoso o solicitud que sean añadidos a la póliza para formar parte de ésta". *Monteagudo Pérez v. E.L.A.*, 172 DPR 12, 20 (2007). (Énfasis nuestro). Véase, además, Art. 11.250 del Código de Seguros, *supra*. Dichos términos serán interpretados de la manera más favorable al asegurado, para proveer la mayor cubierta y cumplir con el propósito del contrato.

El Art. 41.050 del Código de Seguros, *supra,* le exige a los funcionarios de salud e instituciones médicas a tener una póliza de seguros de responsabilidad médico-hospitalaria que cubra no menos de $100,000.00 por incidente y $300,000.00 en agregado cada año. Por lo tanto, es forzoso concluir que un contrato de seguros no puede pactar una cobertura menor que la exigida por ley. Sin embargo, esto no quiere decir que las aseguradoras no

pueden limitar su responsabilidad o las situaciones y circunstancias bajo las cuales se activa la póliza de seguro. Es decir, por ser la oferta en un contrato de seguros una voluntaria, los aseguradores podrán incluir cualquier cláusula de exclusión que no sea contraria a la ley, moral u orden público. 7A *Couch on Insurance 3d*, Sec. 108:3 (1999). Estas "serán interpretadas restrictivamente; las dudas serán resueltas de modo que se cumpla con el propósito de la póliza". *PFZ, Props., Inc. v. Gen. Acc. Ins. Co.*, 136 DPR 881, 902 (1994). Sobre estas, nuestro Tribunal Supremo ha resuelto que:

> [S]i una cláusula de exclusión aplica claramente a determinada situación, la aseguradora no está obligada a responder por los riesgos expresamente excluidos. **Después de todo, una póliza es en última instancia un contrato y, como todo otro contrato, constituye la ley entre las partes. Así, cuando los términos de la póliza son claros, específicos y libre de ambigüedades, las partes tienen que atenerse a lo allí dispuesto**.
>
> *Molina v. Plaza Acuática*, 166 DPR 260, 267-268 (2005). (Cita omitida). (Énfasis nuestro).

Para que una cláusula de exclusión sea válida, esta debe ser clara, específica, libre de ambigüedades y detallar la situación o el riesgo que se excluye; así, se alerta al asegurado sobre los eventos particulares que quedan fuera de la cubierta. *Maderas Tratadas v. Sun Alliance et al.*, 185 DPR 880, 899 (2012). Estas cláusulas, sin embargo, suelen ser utilizadas para excluir ciertos riesgos de la póliza de seguros; no son de utilización para limitar la responsabilidad de la aseguradora por debajo de lo establecido en la póliza.

**D.**

Las aseguradoras son partes en pleitos principalmente por causa de sus vínculos con los alegados causantes de daños. Esto puesto que las aseguradoras, en virtud de los contratos pactados entre ellas y sus asegurados, están llamadas a sustituir a sus asegurados cuando estos deben responder por acciones y

circunstancias contempladas en las pólizas de seguros. En virtud de esta asociación, las aseguradoras tienen derecho a beneficiarse de las defensas que pueden levantar sus asegurados. Sin embargo, esta norma no es absoluta. Nuestro Tribunal Supremo ha reconocido que "la legislatura tuvo la intención de otorgarle al asegurador el derecho de alegar las defensas que podría alegar contra el asegurado, **pero no aquellas defensas puramente personales entre el asegurado y el reclamante**, y que de ninguna manera hubieren surgido o estuvieren relacionadas con el accidente o la póliza". *García v. Northern Assurance Co.*, 92 DPR 245, 255 (1965). (Énfasis nuestro). Esto es, la compañía aseguradora puede esgrimir las defensas que corresponderían a su asegurado, siempre que éstas no sean personalísimas de este último.

Una defensa personalísima es aquella que sólo la puede levantar quien goza de ella y no puede ser transmitida o delegada. En *Quilez-Velar et al. v. Ox Bodies, Inc.*, 198 DPR 1079 (2017), nuestro Tribunal Supremo tuvo la oportunidad de "analizar el efecto que tiene el límite de responsabilidad que cobija a un municipio sobre su codeudor solidario en una acción de daños y perjuicios". *Íd.*, pág. 1080. En esa ocasión, determinó que **"[l]as inmunidades o los límites de responsabilidad que se establecen por ley son excepciones, o defensas, personales que puede presentar un deudor**". *Íd.*, pág. 1089. (Énfasis nuestro). "[A]nte los demandantes, el Municipio ostentaba una **defensa personal de límite de responsabilidad estatutaria**". *Íd.* (Énfasis nuestro). Por lo tanto, el codemandado, Ox Bodies, Inc., sólo podía levantar la defensa personal de límites de responsabilidad en cuanto a la responsabilidad del Municipio, no en cuanto a la suya. "[H]oy resolvemos que un deudor solidario puede valerse del límite de responsabilidad estatutaria que cobija a un municipio codeudor, en

la porción de la deuda que sea atribuible a ese municipio". *Íd.* Esta defensa sólo puede ser levantada por un deudor solidario.

En el ámbito de las aseguradoras, nuestro Tribunal ha resuelto que "[p]ara que exista solidaridad entre una compañía aseguradora y el asegurado, ello debe surgir claramente del contrato de seguros. Dicha solidaridad debe haberse pactado expresamente o, al menos, debe surgir claramente del contenido del contrato que la relación entre las partes se constituyó con tal carácter". *Gen. Accid. Ins. Co. P.R. v. Ramos*, 148 DPR 523, 537 (1999). Dicha norma está plasmada en el Art. 1090 del Código Civil de 1930, *supra*, que dispone que "[l]a concurrencia de [...] dos o más deudores no implica que cada uno de aquéllos tenga derecho a pedir ni cada uno de éstos deba prestar íntegramente las cosas objeto de la misma. **Sólo habrá lugar a esto cuando la obligación expresamente lo determine, constituyéndose con el carácter de solidaria**". *Íd.*, (Énfasis nuestro). Las obligaciones que nacen en virtud de los contratos de seguros no son distintas.

Hemos aludido a que los límites de responsabilidad que establecen las leyes son defensas personales de quienes benefician la ley. Para poder determinar si la Ley Núm. 136-2006, u otra ley pertinente, de alguna forma incluye a las aseguradoras en su alcance, debemos recurrir al texto de esta. El Artículo 7 de la Ley Núm. 136-2006 dispone que "[s]e extenderán las limitaciones impuestas en la Ley Núm. 104 de 29 de junio de 1955, según enmendada, **a los Centros Médicos Académicos Regionales, y miembros de facultad de estos** [...]". (Énfasis nuestro). Por su parte, el Art. 41.050 del Código de Seguros, *supra*, dispone que:

> **Art. 41.050- Responsabilidad Financiera**
>
> [...]
>
> Se aplicarán los límites de responsabilidad que la Ley Núm. 104 del 29 de junio de 1955, según enmendada,

impone al Estado Libre Asociado de Puerto Rico, en similares circunstancias, en los siguientes escenarios:

[...]

(vii) **a los Centros Médicos Académicos Regionales de Puerto Rico, sus estudiantes y miembros de facultad** cuando recaiga sentencia por actos constitutivos de impericia médica hospitalaria (malpractice) cometida por sus estudiantes y miembros de su facultad en el desempeño de sus funciones docentes;

(Énfasis nuestro).

Como podemos ver, ninguno de estos estatutos extiende de manera expresa los límites de responsabilidad a las aseguradoras. Ante el silencio estatutario, los tribunales deben determinar si se trata de una omisión voluntaria o involuntaria. Para esto, debemos recurrir al contexto o al historial legislativo. Dicho análisis debe realizarse manteniendo en mente que los límites de responsabilidad constituyen excepciones, por lo que debemos interpretar su alcance de manera restrictiva, en contra de su existencia.

El 27 de junio de 2011, mediante la Ley Núm. 103-2011, la Asamblea Legislativa enmendó el Art. 7 la Ley Núm. 136-2006 y el Art. 41.050 del Código de Seguros de Puerto Rico para aclarar el alcance de los límites de responsabilidad que estas extienden a los CMAR y facultad docente. En su exposición de motivos, la Ley dispone que "esta Asamblea Legislativa entiende necesario aclarar que **quienes están sujetos a los límites que le aplican al Estado, además de los propios [CMAR], son los estudiantes, residentes y profesionales de salud que en ellos laboren** mientras se encuentren ejerciendo funciones docentes". Exposición de Motivos, Ley Núm. 103-2011. (Énfasis nuestro). Las enmiendas a la Ley Núm. 136-2006 y Código de Seguros de Puerto Rico del 8 de agosto de 2023 tampoco extendieron dichos límites de responsabilidad a las aseguradoras. Ley Núm. 94-2023.

Es forzoso concluir que la omisión de las aseguradoras en el texto del Art. 7 de la Ley Núm. 136-2006 y Art. 41.050 del Código de Seguros fue una intencional. La Asamblea Legislativa ha enmendado las leyes para aclarar sus alcances y nunca ha señalado o extendido los mismos a las aseguradoras. Cónsono con una interpretación restrictiva de las excepciones, debemos concluir que los límites de responsabilidad sólo son de aplicación para aquellos sujetos expresamente señalados en las leyes pertinentes.

Examinado el derecho aplicable, procedemos a aplicar el derecho a los hechos.

**III.**

Por estar los señalamientos de error estrechamente relacionados, los atenderemos en conjunto.

Tanto SIMED como Beazley Group tienen pólizas de seguro a favor de asegurados que gozan de los beneficios de la Ley Núm. 136-2006, *supra*, y el Art. 41.050 del Código de Seguros, *supra*. Es decir que a tanto el Dr. Soler Bernadini como al Hospital San Lucas les son de beneficio los límites de responsabilidad que tiene el Estado por virtud de la Ley de Pleitos, *supra*. Esta fue la conclusión del TPI, cónsona con la decisión del Tribunal Supremo de Puerto Rico en *Ortiz et al. v. Hosp. San Lucas et al., supra*. La misma tampoco ha sido cuestionada por las partes, por lo que no existe controversia sobre este asunto.

Ahora bien, el TPI determinó que dichos límites de responsabilidad no son aplicables a sus aseguradoras, por lo que estas deberán responder hasta el límite de sus pólizas pactadas. Por el contrario, las aseguradoras-apelantes plantean que estas sólo deben responder por la cuantía por la cual responden sus asegurados, es decir, hasta los límites de responsabilidad establecidos por ley. Para esto, han presentado los contratos de seguros que tienen con sus asegurados, que, como veremos

adelante, contienen cláusulas que limitan su responsabilidad hasta aquella de sus asegurados.

Por recurrir de una sentencia sumaria, este Tribunal debe hacer una determinación de los hechos incontrovertidos y controvertidos *de novo*. Sin embargo, ninguna de las partes ha cuestionado las determinaciones que hizo el TPI. No hemos sido presentados con alguna razón para no acoger los mismos. En consecuencia, y en vista de que no existe controversias de hecho, acogemos las determinaciones hechas por el TPI y procedemos a resolver en los méritos, acogiendo las mismas determinaciones de hecho que hizo el TPI.

En primer lugar, el TPI concluyó que los límites de responsabilidad de la Ley Núm. 136-2006 constituyen una defensa personalísima por lo que las aseguradoras no tienen derecho a beneficiarse directamente de ellas salvo exista solidaridad entre estas y sus asegurados. Beazley Group y el Hospital San Lucas cuestionaron dicha conclusión en su *Apelación*.

No podemos obviar que las disposiciones en controversia de la Ley Núm. 136-2006 y el Código de Seguros son concesiones por parte del Estado a favor de los CMAR y su facultad médica docente. Tienen el propósito de fomentar el estudio de la medicina en Puerto Rico y prevenir el éxodo de la clase médica de nuestra jurisdicción. Estas también constituyen excepciones a las normas generales del derecho que los causantes de daños vienen obligados a repararlo completamente, (Véase Art. 1802 del Código Civil de 1930, *supra*) por lo que debemos interpretarlas restrictivamente. *Pueblo v. Pérez Casillas*, 126 DPR 702, 709 (1990) ("Sabido es que en nuestra tarea de interpretar estatutos, hemos adoptado un enfoque restrictivo cuando nos enfrentamos a las excepciones de un principio general").

Como bien determinó el TPI, concluimos que los beneficios de la Ley Núm. 136-2006 únicamente le aplican a aquellas personas y

entidades explícitamente contempladas por la Ley. En el caso ante nos, sólo le aplican al Dr. Soler Bernadini y al Hospital San Lucas, y constituyen defensas personalísimas de estos. Por ser así, las aseguradoras sólo podrán beneficiarse de los límites de responsabilidad de la Ley de Pleitos si se pactó la solidaridad entre ellas y sus asegurados. Para aquello, debemos recurrir a los contratos firmados entre SIMED y Beazley Group y el Dr. Soler Bernadini y el Hospital San Lucas, respectivamente. Luego de evaluar los expedientes, es evidente que ni del *Contrato entre SIMED y el Dr. Soler Bernadini* (*Contrato SIMED*),[42] ni del *Contrato entre Beazley Group y el Hospital San Lucas* (*Contrato Beazley Group*),[43] surge que las partes hayan pactado la solidaridad expresamente. En consecuencia, las aseguradoras-apelantes no pueden levantar los límites de responsabilidad a favor de sus asegurados como defensas, puesto que no existe la solidaridad entre ellos y sus asegurados.

Ahora bien, aquí no termina nuestro análisis, puesto que las aseguradoras-apelantes también han levantado como error que el TPI no consideró cláusulas pactadas en los contratos entre las aseguradoras y sus asegurados que expresamente limitan su responsabilidad a la que sus asegurados están legalmente obligados a pagar. Para esto, también debemos recurrir a los contratos de seguros entre los apelantes para determinar si existe alguna cláusula de exclusión que limite la responsabilidad de las aseguradoras. Recordemos que al final del día, las pólizas de seguros son contratos, por lo que sus cláusulas constituyen la ley entre partes, salvo que sean contrarias a la ley, moral u orden público. Estas delimitan las condiciones y el alcance de las obligaciones pactadas.

La primera página del *Contrato SIMED* dispone que:

---

[42] Apéndice de *Apelación, supra,* Anejo XVI, págs. 491-509.
[43] *Íd.*, págs. 510-557.

### I. Coverage Agreements

The Syndicate will pay on behalf of the Insured with respect only to his practice within the Commonwealth of Puerto Rico:

### Coverage A- Individual Professional Liability

All Sums **which the Insured shall become legally obligated to pay** as damages because of injury to which this policy applies caused by medical incident […].[44]

***De esta cláusula, surge que la aseguradora SIMED y el Dr. Soler Bernadini pactaron que SIMED sólo responderá hasta el monto que viene obligado a responder el asegurado. Es decir, solo responderá por el monto de su responsabilidad. Un lenguaje similar y claro es utilizado en el Contrato Beazley Group, que también limita la responsabilidad de la aseguradora a la responsabilidad legal del Hospital San Lucas.*** Este dispone:

### INSURING AGREEMENTS

### 1. COVERAGE: Medical Professional Liability

In the event that a claim or claims are first made, in writing, against the INSURED during the period of the Policy, and notified in accordance with the Reporting and Claims Handling Condition of this Policy, and provided such claim or claims arise from a MEDICAL INCIDENT happening on or after the Retroactive Date set forth in Item 6 of the Declarations, **Underwriters will indemnify the INSURED for that amount of the ULTIMATE NET SUM PAYABLE which the INSURED shall be legally obligated to pay as damages** […].[45]

Ambas cláusulas limitan la responsabilidad de las aseguradoras a aquella que incurre su asegurado. ¿Puede una cláusula de exclusión limitar la responsabilidad de una aseguradora de tal manera?

Como hemos señalado, las cláusulas de exclusión deben ser claras, específicas, libre de ambigüedades y detallar la situación o el riesgo que se excluye. *Maderas Tratadas v. Sun Alliance et al., supra,*

---

[44] *Íd.*, pág. 494. (Énfasis nuestro y en la original).
[45] *Íd.* (Énfasis nuestro y en la original).

pág. 899. Sin embargo, nuestro ordenamiento jurídico no prohíbe que una aseguradora limite su propia responsabilidad por debajo del monto de la cubierta que ofrece. Las normas sobre la contratación disponen que las partes no podrán contratar cláusulas contrarias a la ley, moral u orden público. No vemos razón para concluir que una cláusula que limite la responsabilidad de una aseguradora a la de su asegurado sea contraria a esta norma. Más aun cuando es principio inmemorial de nuestro derecho que "lo no prohibido está permitido". *Pueblo v. Román Feliciano*, 181 DPR 679, 687 (2011); *Campos del Toro v. Ame. Transit Corp.*, 113 DPR 337, 345 (1982). En el ámbito del derecho de las obligaciones, rige el principio de libertad de contratación. *Arthur Young & Co. v. Vega III*, 136 DPR 157, 169 (1994). Ello implica que el tipo de pactos a que pueden llegar los contratantes está tan sólo limitado por su imaginación, siendo la voluntad de las partes la ley suprema entre ellos. En consecuencia, y cónsono con el derecho esbozado, validamos las cláusulas de límite de responsabilidad que han pactado las aseguradoras-apelantes con sus asegurados.

Mediante esta decisión, dejamos claros que las aseguradoras, por lo general, deben responder hasta el monto de sus pólizas con sus asegurados. El límite de responsabilidad únicamente limita el grado de indemnización cobrable real en contra de quien se beneficia del límite. *Quilez-Velar v. Ox Bodies, Inc.*, *supra*, pág. 1085. Como hemos señalado, una interpretación restrictiva de la Ley Núm. 136-2006 y el Art. 41.050 del Código de Seguros nos obliga a concluir que los límites de responsabilidad de la Ley de Pleitos sólo le aplican a los CMAR y a su facultad médica docente. *Ortiz et al. v. Hosp. San Lucas et al.*, *supra*. En este sentido, concurrimos con el TPI.

Sin embargo, como señalan los apelantes, el TPI erró al no considerar las cláusulas contractuales de los contratos de seguro. Las aseguradoras y sus asegurados pueden contratar cláusulas que

limiten la responsabilidad de las aseguradoras hasta las cantidades que sus asegurados estén obligados a pagar. Tanto el Contrato SIMED como el Contrato Beazley Group contienen cláusulas de esta clase. ***En consecuencia, SIMED y Beazley Group sólo responderán, en el caso de recaer una sentencia que determine que el Dr. Soler Bernadini y el Hospital San Lucas incurrieron en acciones u omisiones culposas, por las cantidades que estos están legalmente obligados a pagar, según lo pactado en sus respectivos contratos de seguros***. Así, se cumple con las normas de la libertad de contratación. En consecuencia, revocamos la determinación del TPI por ser contraria a lo que aquí hemos resuelto.

**IV.**

Por las razones discutidas, revocamos la *Sentencia Parcial* del TPI.

Lo acordó y manda el Tribunal y lo certifica la Secretaria.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones